# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 05-80183-CIV-SEITZ/MCALILEY

BOCA RATON COMMUNITY HOSPITAL, )
INC., a Florida not-for-profit corporation d/b/a )
BOCA RATON COMMUNITY HOSPITAL, on )
behalf of itself, and on behalf of a Class of all )
others similarly situated, )
)
          Plaintiff, )
)
v. )
)
TENET HEALTHCARE CORPORATION, )
)
          Defendant. )

## DECLARATION OF THOMAS A. SCULLY PURSUANT TO 28 U.S.C. § 1746

I, Thomas A. Scully, hereby declare:

1. I served as the Administrator of the Health Care Financing Administration, later renamed the Centers for Medicare and Medicaid Services, from May 2001 to December 2003. CMS administers the Medicare program, and in my role as Administrator, I was responsible for all aspects of the Medicare program, including hospital outlier payments.

2. Medicare reimburses hospitals at predetermined, or capitated, rates called Diagnosis Related Groups (DRGs). For high cost cases that far exceed the average utilization of services, Congress created an "outlier" program to pay hospitals extra for particularly high cost cases. The outlier payment system allocated from 5-6% of all inpatient hospital payments for these high cost cases each year. The payment for calculating these outliers reexamined a hospital's "charges," and that hospital's historical relation of charges to actual costs in determining whether the hospital had a true cost that exceeded the regulatory threshold for outlier payments. The "cost to charge ratio" was based on settled costs reports. Unfortunately, these "settled cost reports" were sometimes three or four years old, and there was a significant time lag between what CMS thought hospitals' cost to charge ratios were—and what the hospitals' actual cost to charge ratios were.

3. Unfortunately, numerous providers around the country took advantage of this flawed system to claim significantly higher outlier payments than the system envisioned, because CMS failed to understand what was happening in its own payments system. During this period, CMS did not regulate or limit a hospital's charges, nor did it regulate the listing of charges



for the purposes of controlling outlier payments. Medicare also did not require any particular logical connection between costs and charges used to generate outliers. The system was simply flawed, and hundreds of hospitals took advantage of this unfortunate regulatory glitch to claim higher payments.

4. I have said publicly many times that this behavior was unfortunate and outrageous—but clearly not illegal. These hospitals, led by TENET and many other Pennsylvania and New Jersey non-profit systems, simply understood the system better than CMS did—and took advantage of it for at least three years. I did not like what TENET and these other hospitals did, and I aggressively moved to shut it down. I repeatedly explained this to the press and did everything I could to stop what I considered to be inappropriate, but sadly legal, billings. Once I understood the abuses, I started briefing the press in October of 2002, and called TENET's CEO, and other hospital system executives to demand that it stop. I further expressed my immediate intention to put out new regulations to stop the abuses.

5. To their credit, TENET voluntarily stopped billing under abusive outlier mechanisms in January of 2003—responding to my requests, and following the formulas CMS had suggested would be in a new rule. Due to very intense political pressure from the Pennsylvania and New Jersey Congressional delegations—which included numerous hearings—I could not put out new regulations until August of 2003. During the period of January 2003 to August 2003, virtually all of the Pennsylvania and New Jersey hospitals at issue continued to bill under what I considered to be outrageous outlier policies. Despite extensive testimony and briefings, Congress continually opposed the issuance of new regulations. In spite of continued fierce Congressional opposition, I finally issued the new regulations to remedy the problem in August 2003.

6. I have continually expressed my opinion publicly that the behavior of hundreds of hospital in this case was outrageous, but not unlawful. It is unfortunate that CMS did not understand its own regulations, and sadder still that many hospitals felt compelled to abuse them. To TENET's credit, when confronted, they voluntarily ceased the behavior. Hundreds of other hospitals continued to mount a political campaign to protect their payments, and continued to bill Medicare for additional payments for eight months, before I could shut it down.

7. The new outlier regulations track more closely to a hospital's true spending. The regulations were clearly not retroactive—in fact I was only able to put them in place prospectively over strenuous objection from senior leaders in Congress.

8. In my view, the policy and the behavior were very unfortunate, but not illegal. The behavior of many hospitals that continued their billing practices during much of 2003—legally—along with the clearly articulated opposition to "reform" by many in Congress, show that TENET was, by far, not the worst player in this ugly regulatory fiasco.

9. The fact that we had to craft a new regulation to fix the situation, in itself, clearly indicates that the inappropriate practices under the original regulation did in fact fall with the scope of the law. While I was less than happy with TENET's behavior, at my request they voluntarily chose not to claim over $350 Million of outlier claims from January to August of 2003, while

hundreds of other hospitals did in fact file claims and receive payments for well over $1 Billion during that period—and they still retain those funds today.

10. This may have been the most unpleasant policy battle of my CMS tenure. Still, among the 700-800 hospitals that abused the flawed outlier system TENET's behavior was – relatively – meritorious.

I declare, under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 23rd day of December 2005 in Alexandria Virginia

Thomas A. Scully