Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 05-80183-CIV-SEITZ/MCALILEY

|  |  |
|---|---|
| BOCA RATON COMMUNITY HOSPITAL, INC., a Florida not-for-profit corporation d/b/a BOCA RATON COMMUNITY HOSPITAL, on behalf of itself, and on behalf of a Class of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TENET HEALTHCARE CORPORATION,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

TENET HEALTHCARE CORPORATION'S MEMORANDUM IN OPPOSITION TO
BOCA RATON COMMUNITY HOSPITAL'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AND IN SUPPORT OF TENET HEALTHCARE CORPORATION'S
CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Peter Prieto (FL Bar No. 501492)
Scott D. Ponce (FL Bar No. 0169528)
HOLLAND & KNIGHT LLP
701 Brickell Avenue, Suite 3000
Miami, FL, 33131
(305) 374-8500 (tel.)
(305) 789-7799 (fax)

Jay P. Lefkowitz
Karen N. Walker
Susan E. Engel
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC  20005
(202) 879-5000 (tel.)
(202) 879-5200 (fax)

*Attorneys for Tenet Healthcare Corp.*

December 23, 2005

**TABLE OF CONTENTS**

Page

INTRODUCTION .................................................................................................1

I.    STANDARD FOR SUMMARY JUDGMENT. ..............................................2

II.   BOCA IS NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT,
      BECAUSE THERE ARE GENUINE ISSUES OF MATERIAL FACT FOR
      WHICH DISCOVERY IS NECESSARY. ...................................................3

      A.    Boca's Failure To Submit A Rule 7.5 Statement Is Prejudicial And
            Precludes Judgment In Its Favor. .....................................................3

      B.    Boca's Summary Judgment Motion Raises Questions Of Material Fact
            That Are In Dispute And For Which Discovery Is Necessary. .................5

            1.    Boca's Motion Raises Material Factual Issues That Are Not
                  Resolved. .......................................................................5

            2.    Tenet Has Not Had An Adequate Opportunity For Discovery On
                  Factual Questions Essential To Its Opposition. ...........................9

III.  BOCA IS NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT, AND
      TENET IS ENTITLED TO PARTIAL SUMMARY JUDGMENT, BECAUSE
      THE ALLEGED CONDUCT WAS LAWFUL UNDER MEDICARE. ...........11

      A.    No Medicare Provision Limits Outlier Reimbursement To
            "Extraordinarily Costly Cases." ......................................................13

      B.    Medicare Does Not Restrict The Amount Of A Hospital's Charges. .........17

      C.    The Administrative Record Demonstrates That Tenet's Alleged Conduct
            Is Not Unlawful. ..........................................................................21

            1.    The DOJ Amicus Brief Is Owed No Deference, Because DOJ Is
                  Not Charged With Administering Medicare. ..............................22

            2.    CMS Has Recognized That Medicare Does Not Prohibit A
                  Hospital From Submitting High Charges For Outlier
                  Reimbursement. ..............................................................23

            3.    CMS Revised The Outlier Regulations In 2003 To Tie Outlier
                  Payments More Closely To Actual Costs But Did Not Make The
                  New Rules Retroactive. .....................................................26

CONCLUSION ................................................................................................28

## INTRODUCTION

Boca Raton Community Hospital (Boca) moves for partial summary judgment on its California unfair competition claim (Count V), and Tenet's seventh and fourteenth affirmative defenses. Boca claims that the California claim and the two defenses turn on whether Tenet's *alleged* conduct was unlawful, and that this raises a pure question of law: whether Medicare imposes a limit on the charges a hospital submits for outlier reimbursement. Boca's motion is a non-starter. As then-CMS Administrator Thomas Scully explains in the attached declaration, the Medicare statute and outlier regulations do not regulate or limit a hospital's charges, nor do they require any particular connection between the costs and charges submitted for outlier reimbursement. *See* Declaration of Thomas A. Scully ¶ 3, attached as Exhibit 1. Indeed, CMS amended the outlier regulations in 2003 for that very reason. *See id.* ¶ 9. Because the conduct alleged -- submitting high charges for outlier reimbursement -- was lawful under Medicare, *see id.* ¶¶ 4, 6, 8-9, Tenet not only opposes Boca's summary judgment motion, but by separate motion attached to this memorandum, and based on the attached statement of undisputed facts, Tenet also respectfully requests that the Court grant summary judgment for Tenet and find that the allegations do not establish a violation of the Medicare statute or outlier regulations.

Tenet opposes Boca's summary judgment motion on the grounds that, as presented, the motion raises significant questions of fact that have not yet been resolved and that Tenet has not had an adequate time to pursue on discovery. In contrast to Tenet's cross-motion, which seeks only for this Court to determine, as Scully declares, that Medicare does not limit the charges submitted for outlier reimbursement and that the alleged conduct -- submitting high charges for outlier reimbursement -- was lawful, Boca asks this Court to determine that Tenet's alleged conduct is *unlawful* because Medicare sets *some* undetermined limit on charges. Even assuming that, contrary to the Scully Declaration, there is a limit on the charges a hospital submits for

outlier reimbursement, Boca still has not demonstrated that Tenet's allegedly high charges were unlawful, because Boca has come forward with no evidence that Tenet's charges *exceeded* any Medicare limit. Significant factual questions remain, including what any limit would be under Medicare law, whether Tenet's charges exceeded that limit, and whether CMS was aware of or approved Tenet's charges and other hospitals' high charges. Boca's allegations do not purport to answer these questions, and must be denied.

## I.    STANDARD FOR SUMMARY JUDGMENT.

Federal Rule of Civil Procedure 56(c) states that summary judgment is appropriate when "'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact *and* that the moving party is entitled to a judgment as a matter of law.'" *Konikov v. Orange County, Fla.*, 410 F.3d 1317, 1321 (11th Cir. 2005) (quoting Fed. R. Civ. P. 56(c)) (emphasis added). As construed by the United States Supreme Court, Rule 56 imposes an "initial responsibility" on the movant "of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To that end, this Court requires, by way of Local Rule 7.5(A), that a party moving for summary judgment accompany its motion with "a concise statement of the material facts as to which the movant contends there is no genuine issue to be tried." A court reviews the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and it resolves all reasonable doubts about the facts in favor of the nonmovant. *See Clemons v. Dougherty County, Ga.*, 684 F.2d 1365, 1369 (11th Cir. 1982). "If the record presents factual issues, the court must not decide them; it must deny the motion ....'" *Id.*

2

## II. BOCA IS NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT, BECAUSE THERE ARE GENUINE ISSUES OF MATERIAL FACT FOR WHICH DISCOVERY IS NECESSARY.

Boca's motion is procedurally flawed. Boca fails to submit a statement of undisputed material facts, as required by the local rules, *see* Local Rule 7.5(A); it ignores the summary judgment standard by seeking judgment based on the allegations of its Complaint without coming forward with any affirmative evidence; and it requests that this Court resolve a hypothetical legal question that turns on significant factual issues that are in dispute and that Tenet has not yet been able to pursue in discovery. Thus, before the Court even reaches the merits of Boca's motion, which is contrary to the Scully Declaration, partial summary judgment must be denied.

### A. Boca's Failure To Submit A Rule 7.5 Statement Is Prejudicial And Precludes Judgment In Its Favor.

Local Rule 7.5(A) requires a party moving for summary judgment to file a "concise statement of the material facts as to which the movant contends there is no genuine issue to be tried." Despite this clear rule, Boca claims it need not submit a Rule 7.5 Statement, because its motion "presents a pure question of law." Boca Mot. at 2 n.5. Boca's "law" excuse falls flat. Every summary judgment motion presents a "pure question of law," insofar as the issue does not turn on any material factual disputes. Rule 7.5(A) thus applies to *all* summary judgment motions, not just those a movant deems too "legal" to satisfy the requirement. It is also simply not correct that Boca's motion presents only a question of law. Its motion rests on allegations in the Complaint that would require that this Court resolve whether Tenet's hospitals charged prices that exceeded some undetermined legal limit that Boca claims exist.

Boca not only fails to submit a Rule 7.5 Statement, but its memorandum also relies on allegations that are not in the Complaint. Thus, for example, Boca requests that this Court

3

"declare now that Tenet may not assert it had a legal right to charge anything it wanted in billings under the Medicare outlier program." Boca Mot. at 2. But the Complaint contains no allegation that Tenet charged "anything it wanted."[1] Boca also asserts in a footnote that it "is not asking the Court to determine that Medicare regulates hospital charges or that Medicare law and regulations prescribe a specific relationship between costs and charges." Boca Mot. at 4 n.9. Yet, the substantial part of Boca's motion argues precisely that point: that Medicare *prohibits* Tenet from charging "whatever it wants" to obtain outliers.

The purpose of the Rule 7.5 Statement is to clarify the facts the movant believes are undisputed and material to summary adjudication. A statement of undisputed facts frames the issue presented, enables the non-movant to controvert those facts (as Rule 7.5(D) requires), and allows the Court to evaluate the motion. *See, e.g., Tennant v. Florida*, 111 F. Supp. 2d 1326, 1329 n.3 (S.D. Fla. 2000). Rule 7.5(A) is not just a technical requirement that a movant may choose to follow or not follow at its whim. Had Boca bothered to comply with the rule, responding to its motion would not be guesswork. Boca's failure to submit a Rule 7.5 Statement is thus significantly prejudicial to Tenet's ability to respond, and Boca's motion should be denied on this ground alone. *Cf. In re Air Crash Near Cali, Colombia on December 20, 1995*, 985 F. Supp. 1106, 1151-52 (S.D. Fla. 1997) (declining to deny motion for non-compliance with Rule 7.5(C), where non-movant suffered "no meaningful prejudice"), *vacated in part on other grounds, Piamba Cortes v. American Airlines, Inc.*, 177 F.3d 1272 (11th Cir. 1999).[2]

---

[1]    Given that there is no such allegation in the Complaint, ruling on this hypothetical question would therefore amount to issuing an advisory opinion, which this Court may not do. *See, e.g., Jews for Jesus, Inc. v. Hillsborough Cty. Aviation Auth.*, 162 F.3d 627, 629 (11th Cir. 1998) (quoting *Princeton Univ. v. Schmid*, 455 U.S. 100, 102 (1982) ("We do not sit to decide hypothetical issues or to give advisory opinions about issues as to which there are not adverse parties before us.")).

[2]    Boca also asks the Court to "exclude any further statements by Tenet in the course of this litigation that it had the right to charge anything it wanted to obtain Outlier payments." Boca Mot. at 2; *see also id.* at 3-4 (citing Rule 56(d) cases). Not only does Boca fail to allege that Tenet charged "anything it wanted,", but Boca also is

4

### B.    Boca's Summary Judgment Motion Raises Questions Of Material Fact That Are In Dispute And For Which Discovery Is Necessary.

Boca claims that this Court should enter summary judgment on its California claim and dismiss Tenet's seventh and fourteenth affirmative defenses, because the conduct *alleged* is unlawful. Boca's request is contrary to fundamental rules of civil procedure. Boca is not entitled to rest on its allegations. Rather, it must come forward with affirmative evidence demonstrating that those allegations are undisputed, and therefore no genuine issues of material fact remain to be resolved as to the nature and legality of Tenet's conduct. *See Konikov*, 410 F.3d at 1321. This it cannot do. There is no evidence in the record as to what Tenet charged, much less that Tenet inflated its charges *above* any limit that Medicare permits. Material factual issues remain to be developed and resolved before these questions could potentially be appropriate for consideration on Boca's motion for summary judgment.

### 1.    Boca's Motion Raises Material Factual Issues That Are Not Resolved.

Boca does not even purport to show what facts are undisputed, but instead claims it is entitled to judgment because one of Tenet's affirmative defenses states that the conduct *alleged* was lawful. Boca Mot. at 4 (citing seventh affirmative defense). As an initial matter, only the seventh affirmative defense refers to Boca's allegations.[3] The fourteenth defense states that

---

not entitled to what is in essence a motion in limine ruling. Rule 56(d) authorizes a court, upon *denying* a motion for summary judgment, to make findings on what facts are undisputed in order to narrow the issues for trial. *See Antenor v. D & S Farms*, 39 F. Supp. 2d 1372, 1375 (S.D. Fla. 1999); *Warner v. United States*, 698 F. Supp. 877, 878-79 (S.D. Fla. 1988) ("a party may not make an independent Rule 56(d) motion" for a finding of fact on an issue that does not dispose of an entire cause of action); *see also* Fed. R. Civ. P. 56(d) ("[The court] shall thereupon make an order specifying the facts that appear without substantial controversy .... Upon the trial of the action the facts so specified shall be deemed established...."). Having moved for summary judgment based on the *allegations* in the Complaint, argued that its motion does not concern any factual questions, and failed to submit a Rule 7.5 Statement, Boca cannot also request that the Court enter an order as to what *facts* are undisputed.

[3]    Even the seventh defense does not turn only on the legality of Tenet's actions. Rather, the seventh defense provides that: "Tenet's actions alleged by plaintiffs were lawful, justified, and carried out in furtherance of Tenet's legitimate business interests." Boca has not argued that the alleged conduct was not justified or carried out in furtherance of Tenet's legitimate business interests.

"Tenet's actions" were permitted by federal or state law. And Count V is Boca's own California claim. There is thus no basis whatsoever for ignoring the summary judgment standard. Rather, before this Court may rule Tenet's conduct unlawful, Boca must present undisputed evidence that Tenet engaged in the alleged "inflated charging scheme," and it must demonstrate that Tenet's actual conduct amounted to a violation of California's unfair competition law. *See, e.g.,* *Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999) (cause of action under Cal. Bus. Prof. Code § 17200 requires proof that defendant engaged in acts or practices that were unlawful, unfair, or fraudulent).

This Boca has not done. To the contrary, as described in the attached Declaration of Peter Prieto, attached as Exhibit 2, material factual issues remain to be developed and resolved, including the threshold facts surrounding Tenet's conduct. Boca *alleges* that Tenet engaged in an "inflated charging scheme," and that "Tenet Hospitals" "submit[ted] inflated Outlier patient charges," Boca Compl. ¶¶ 100(e)-(f), but it has come forward with no affirmative evidence on what Tenet hospitals charged, how much Tenet hospitals' services cost, the relationship between those costs and charges (and whether that relationship was unreasonable), or how much in outlier payments Tenet hospitals received based on particular charges. *See* Prieto Decl. ¶ 4.

Nor is there evidence that other hospitals' (including Boca's) charges or outliers were all lower than Tenet hospitals'. *See id.* ¶ 5. To the contrary, "hundreds of hospitals" used high charges for outlier reimbursement, and indeed, in contrast to Tenet's decision in January 2003 to voluntarily reduce its outlier requests before the amended rule went into effect, "hundreds of other hospitals" continued to submit high charges for outlier reimbursement until the amended outlier regulations issued in August 2003. Scully Decl. ¶¶ 5-6; *see also Medicare Outlier Payments to Hospitals: Hearing Before Subcomm. on Labor, Health & Human Servs. of the Sen.*

6

*Comm. on Appropriations*, 108th Cong. 268 at 7 (Mar. 11, 2003) (testimony of Thomas A. Scully, Administrator of CMS) ("Scully Testimony") (noting that a non-Tenet hospital "received outlier payments of 129 percent of its DRG payments"), attached as Exhibit 3.

There is also no evidence in the record that describes any CMS policy or practice that limited the amount of a hospital's charges or prohibited a hospital from submitting the charges actually billed (and listed on its chargemaster) for outlier reimbursement. *See* Prieto Decl. ¶ 4. To the contrary, the only facts in the record demonstrate that CMS did *not* restrict a hospital's charges, and that "Medicare also did not require any particular logical connection between costs and charges used to generate outliers." Scully Decl. ¶ 3. Boca alleges that "only Tenet knew that the Outlier Threshold was increasing primarily as a result of its own inflated charging scheme ...," Compl. ¶ 110, but Boca presents no evidence showing either Tenet's knowledge, or the absence of knowledge on the part of CMS or other hospitals. Again, to the contrary, CMS auditors recently completed reviews of the charging practices of several Tenet hospitals during the relevant time period, including USC University Hospital and Brownsville Medical Center, which Boca identifies in its Complaint, Compl. ¶ 94, and in Notices of Program Reimbursement, stated that "the auditor did not find any unreasonable or different charging practices on varies type of patients." Declaration of Craig Armin ¶¶ 4,7, attached as Exhibit 4.

Even if it were permissible to simply take Boca's allegations as true on summary judgment, the motion still raises factual questions about Tenet's charging practices, other hospitals' charging practices, and CMS policies and practices. This is because the Court cannot find the alleged conduct unlawful by deciding in the abstract that there is *some* limit on the amount a hospital may submit for outlier reimbursement, as Boca suggests. Rather, to make such a finding, the Court would have to resolve *what* that limit is (which Boca concedes raises

factual questions, Boca Mot. at 4 n.9), *and* it would have to find that Tenet's charges were inflated *above* that limit. Thus, for example, if contrary to Scully's assertions, *see* Scully Decl. ¶ 3, outlier reimbursement requires a reasonable relationship between costs and charges, this Court must determine (i) what relationship would be "reasonable," (ii) whether Tenet charged prices for any services that were not reasonably related to the costs of that particular service, and (iii) whether Tenet received outlier payments for any patients that were charged a price not reasonably related to the cost of that patient's services. These are simply not findings that can be made on summary judgment, even if there were any evidentiary record upon which to make them.

Finally, Boca's motion must fail as to Count V for the additional (and critical) reason that Boca has come forward with *no* affirmative evidence, let alone undisputed evidence, to prove its claim. *See* Prieto Decl. ¶ 5. To prove a claim under California's unfair competition law, Boca most show either (i) that Tenet engaged in unlawful business acts, which as discussed herein, it has not done because it has offered no evidence that Tenet's charges exceeded any legal limit; (ii) that Tenet engaged in unfair business acts, which it has not done because it has offered no evidence that Tenet engaged in "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition," as required under California law, *Cel-Tech*, 20 Cal. 4th at 187; or (iii) that Tenet engaged in "fraudulent" business acts, which as Boca has already conceded, it cannot do, *see* 6-20-05 Tr. at 125-128 (Mot. to Dismiss Hr'g) (conceding that Boca is not advancing a fraud theory, and dropping "fraudulent" from ¶¶ 168, 171 and 172 of the Complaint), attached as Exhibit 5.

8

Nor is there any evidence that Boca, as a Florida hospital, is entitled to bring a claim under California's unfair competition law. Florida choice-of-law rules require application of the law of the state with the most significant relationship, and "under most circumstances the state where the injury occurred would be the decisive consideration in determining the applicable choice of law." *Barker v. Anderson*, 546 So. 2d 449, 450 (Fla. 1st DCA 1989) ("[T]he place of injury is the primary contact to be considered) (citing *Bishop v. Florida Specialty Paint Co.*, 389 So.2d 999, 1001 (Fla. 1980)). Here, there is no evidence showing that Boca was *injured*, let alone that Boca was injured in California. To the contrary, the record shows that Boca is a Florida hospital and that the Florida AG has brought an action under Florida law addressing the exact same alleged injuries to 13 Florida public hospitals. Boca certainly is not entitled to summary judgment on a claim it cannot bring, and Tenet is entitled to discovery on these factual questions.

> 2.  **Tenet Has Not Had An Adequate Opportunity For Discovery On Factual Questions Essential To Its Opposition.**

Federal Rule of Civil Procedure 56(f) provides that where, as here, a party opposing the motion for summary judgment raises factual questions, the Court may "refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just." Courts of this Circuit have routinely denied or delayed decision on summary judgment until the party opposing summary judgment has been afforded ample opportunity to conduct discovery on disputed issues of fact. *See e.g.*, *Sec'y of Labor v. Burger King Corp.*, 955 F.2d 681, 684 (11th Cir. 1992) ("[I]t was not proper for the district court to consider a motion for summary judgment while the Secretary's two discovery motions were pending."); *WSB-TV v. Lee*, 842 F.2d 1266, 1269 (11th Cir. 1988) (summary judgment where plaintiffs had been afforded no opportunity for discovery

"was erroneous"); *Cowan v. J.C. Penney Co.*, 790 F.2d 1529, 1532 (11th Cir. 1986) ("We have held that, generally, summary judgment is premature when the moving party has not answered the opponent's interrogatories."). Indeed, the precedent on this point is drawn directly from *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), which makes clear that summary judgment is appropriate only "after adequate time for discovery."

There can be no doubt that Tenet has not had adequate opportunity for discovery on any of the factual questions discussed above, including whether CMS had a policy or practice of regulating charges used for outlier reimbursement or whether other hospitals submitted high charges for (and received) outlier reimbursement. Prieto Decl. ¶¶ 4-5. Pursuant to the parties' agreement and this Court's order, discovery was stayed until this Court's ruling on Tenet's motion to dismiss on August 29, 2005. Discovery was delayed further until a protective order was entered on September 15, 2005. Since that time, Tenet has diligently conducted discovery, issuing document requests and interrogatories to Boca, the Florida AG, and the Florida public hospital plaintiffs, as well as document requests to third party hospitals. *See id.* ¶ 3. To date, Tenet has received only three boxes of documents from Boca, and documents from only five of the nine third party hospitals issued subpoenas.[4] *See id.* This single installment from Boca does not satisfy Boca's discovery obligations. Once the outstanding requests have been satisfied and Tenet has the opportunity to review those documents and responses, Tenet also anticipates the need for a substantial number of depositions on these issues, including the CMS and Boca witnesses identified in Boca's initial disclosures, so that Tenet can build a record demonstrating that hospitals (including Boca) in fact submitted "inflated" charges for outlier reimbursement,

---

[4]    In contrast, Tenet has responded to two sets of document requests and produced over 3.5 million pages of documents to Boca (and the AG and public hospital plaintiffs).

that CMS knowingly reimbursed hospitals for outliers based on "inflated" charges, and that CMS policy and practices imposed no limit on hospitals' charges. *See id.* ¶¶ 4-5.

The deadline for discovery in this case is August 1, 2006. At this early stage, Tenet is not requesting that the Court compel Boca's compliance with discovery requests, but the need for and continuing nature of discovery in this case is clear and precludes summary judgment in Boca's favor.

**III.  BOCA IS NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT, AND TENET IS ENTITLED TO PARTIAL SUMMARY JUDGMENT, BECAUSE THE ALLEGED CONDUCT WAS LAWFUL UNDER MEDICARE.**

Boca alleges in its Complaint that Tenet engaged in an "inflated charging scheme," and that "Tenet Hospitals" "submit[ted] inflated Outlier patient charges." Boca Compl. ¶¶ 100(e)-(f); *see also id.* ¶ 171 (in violation of § 17200, Tenet engaged in "unlawful, unfair and or fraudulent deceptive acts or practices," including "wrongfully inflat[ing] its charges in order to obtain excess Outlier payments," and "wrongfully tak[ing] [money] from the Outlier Pool (*i.e.*, Outlier overpayments)"). That alleged conduct underlies every count in Boca's Complaint, and it is the basis for Boca's claim that Tenet's alleged conduct violated the Medicare Act. In order to prevail on its motion, however, Boca must demonstrate that Tenet submitted charges that *exceeded* some Medicare charge limit. This it cannot do without raising disputed factual questions, and summary judgment is therefore not appropriate in favor of Boca.

By contrast, no factual development is necessary for this Court to find as a matter of law that Tenet's alleged conduct did not violate Medicare. The Medicare statute and outlier regulations do *not* impose any limit on the charges a hospital submits for outlier reimbursement. *See* Scully Declaration ¶ 3. Therefore, even taking as true Boca's allegations that Tenet submitted "inflated charges" for outlier payments, the record proves conclusively that Tenet's alleged past conduct complied with the requirements of Medicare. Tenet therefore not only

11

opposes Boca's summary judgment here, but by separate motion attached to this memorandum, respectfully requests that this Court grant summary judgment for Tenet on the question whether the conduct alleged in the Complaint violated the Medicare statute or outlier regulations.

Boca's argument that Medicare imposes *some* limit on charges submitted for outlier reimbursement rests on essentially two points: (1) outliers are intended to compensate hospitals for "extraordinarily costly cases," Boca Mot. at 6-13; and (2) this Court must defer to CMS's interpretation of the outlier regulations as expressed in DOJ's amicus brief, Boca Mot. at 13-14. On one point, Tenet agrees: this Court should defer to CMS's interpretation of the outlier regulations. This is not, however, as Boca contends reflected in the amicus brief of DOJ (which did not purport to express the views of CMS), but is expressed through CMS's rulemaking.

The attached Declaration of Thomas Scully, who was the Administrator of CMS from 2001 to 2003, reflects Mr. Scully's interpretation -- as the person "responsible for all aspects of the Medicare program, including hospital outlier payments," Scully Decl. ¶ 1 -- of what conduct was lawful under the Medicare statute and outlier regulations. Contrary to Boca's allegations, Mr. Scully states that:

> CMS did not regulate or limit a hospital's charges, nor did it regulate the listing of charges for the purposes of controlling outlier payments. Medicare also did not require any particular logical connection between costs and charges used to generate outliers.

Scully Decl. ¶ 3. Medicare thus does not limit outlier payments to some undefined category of "extraordinarily costly cases," nor does it impose any limit on charges submitted for outlier reimbursement. This Court should therefore rule as a matter of law that the alleged conduct -- submitting high charges for outlier reimbursement -- did not violate Medicare law or regulations, as Mr. Scully explains, *see* Scully Decl. ¶¶ 4, 6, 8, 9 ("In my view, the policy and behavior were very unfortunate, but not illegal.").

12

A.  **No Medicare Provision Limits Outlier Reimbursement To "Extraordinarily Costly Cases."**

Boca alleges that Tenet inflated its charges, and although it does not specifically say so in its Complaint, it argues in its summary judgment motion that by doing so, Tenet received outlier payments for cases that were not extraordinarily costly. Boca Mot. at 9-10. According to Boca, this violates Medicare because the outlier statute, "on its face," allows reimbursement only for "extraordinarily costly" cases, and because legislative history and CMS comments likewise indicate an intent to award outlier payments only for costly cases. Boca Mot. at 6-10. Despite Boca's claim to rely on the plain language of the outlier provisions, there is nothing in the text that limits outlier payments to extraordinarily costly cases. The Medicare statute provides that hospitals are entitled to outlier payments based on its "charges" and "costs," but it does not define either term. 42 U.S.C. § 1395ww(d)(5)(A)(ii)). The legislative history is equally unhelpful because, although it refers to "extraordinarily costly cases," it does not define that term. CMS regulations fill in the gap. Instead of limiting outlier payments to cases that are "extraordinarily costly," the regulations calculate outlier payments based on a hospital's "billed charges" for each patient, as well as the hospital's annual costs. The regulations do not purport to require that a hospital or fiscal intermediary determine the costs attributable to an individual patient. Indeed, CMS has recognized that "costs are *not* reported for individual cases," and that "the only way to identify cost outlier cases is to adjust *reported charges*." *Medicare Program*, 59 Fed. Reg. 27708, 27925-26 (emphasis added). Boca does not claim that CMS's outlier regulations conflict with the statute, nor does it attempt to explain, or point to any regulation explaining, what cases would qualify as "extraordinarily costly" in the eyes of Congress. There is no basis for imposing an undefined limitation on clear regulatory provisions.

The relevant Medicare statute governing outliers is 42 U.S.C. § 1395ww(d)(5)(A).  This provision provides that hospitals may request an outlier payment "in any case where charges, adjusted to cost, ... exceed the sum of the applicable DRG prospective payment rate plus any amounts payable under subparagraphs (B) and (F) plus a fixed dollar amount determined by the Secretary ...." *Id.* § 1395ww(d)(5)(A)(ii)).  This means that if "charges, adjusted to cost," are greater than the standard Medicare payments and the outlier threshold (which CMS sets annually), a hospital may request an outlier payment.  The statute also provides that the "amount of such additional payment ... shall be determined by the Secretary and shall ... approximate the marginal cost of care beyond the cutoff point [*i.e.*, the fixed payments plus the outlier threshold]." *Id.* §1395ww(d)(5)(A)(iii).  The statute does not define either "costs" or "marginal cost of care."

Boca argues that the provisions discussing "marginal cost of care" and "charges, adjusted by costs," limit outlier payments to "extraordinarily costly cases." Boca Mot. 7-8. As an initial matter, CMS has implemented regulations defining these provisions, and Boca has not challenged those regulations (nor could it).  Boca's attempt to construe ambiguous terms like "costs" and to channel Congressional intent as though CMS had not issued regulations is therefore beside the point.  The agency has already filled in the gaps. *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984).

In any event, the statutory language does not support Boca's argument.  The first provision requires that the amount of outlier payments shall "approximate the marginal cost of care." 42 U.S.C. § 1395ww(d)(5)(A)(iii).  This does not speak to whether a hospital may request an outlier payment; it governs only the "amount of such additional payment" by CMS.  And as CMS explained, the "[m]arginal cost is the change in total cost associated with a one unit change

14

in output. Due to the presence of fixed costs, the marginal cost of care is generally less than the average cost." *Medicare Program*, 48 Fed. Reg. 39752, 39776 (Sept. 1, 1983). CMS thus does not reimburse hospitals for 100% of the costs exceeding the outlier threshold; it reimburses them for the "marginal costs," which CMS has determined is "equal to 80 percent of the combined operating and capital costs in excess of the fixed-loss threshold." *Medicare Program*, 68 Fed. Reg. 34494, 34495 (June 9, 2003); *see also Medicare Program*, 67 Fed. Reg. 49982, 50122 (Aug. 1, 2002). Nothing in this regulation purports to limit the charges a hospital may submit for outlier reimbursement.

The second provision Boca relies on is the requirement that outlier payments be awarded where charges "adjusted to costs," exceed a certain amount. 42 U.S.C. § 1395ww(d)(5)(A)(ii). This too does not limit outliers to extraordinarily costly cases or restrict the amount of a hospital's charges. The provision, on its face, does not define "costs." It merely directs fiscal intermediaries to adjust "charges" "by costs," leaving CMS to fill in the gaps.

CMS, the agency charged with administering the Medicare program, did fill in the gaps, implementing regulations that establish an outlier formula and define "charges" and "costs." In broad terms, the outlier formula directs the fiscal intermediary to make outlier payments where the hospital's charges, "adjusted to operating and capital costs" exceed the fixed Medicare payments and outlier threshold. 42 C.F.R. § 412.80(a). Boca cites this provision, suggesting that the use of the word "costs" "reflect[s] CMS's intention to effectuate the same purposes and limitations expressly set forth in the Outlier Statute." Boca Mot. at 11. This argument makes no sense. This provision uses the term "costs," not "extraordinary costs," and the regulations separately define the term "costs." "Costs" are the patient's "billed charges … adjusted by the cost to charge ratios" that "are computed annually" by the intermediary from the hospital's "cost

15

report." 42 C.F.R. §§ 412.84(g),(h). And as CMS has recognized, those cost-to-charge ratios are based on aggregate charge and cost data that is typically three years out of date. *See* Scully Decl. ¶ 2; 68 Fed. Reg. at 34497 ("[T]he covered charges on bills submitted for payments during FY 2003 are converted to costs by applying a cost-to-charge ratio from cost reports that began in FY 2000 or, in some cases, FY 1999 or even earlier."). This means that CMS uses "billed charges" and outdated charge and cost data as a proxy for the "costs" of a case. Boca may not like how CMS defines "costs," but it cannot simply ignore the regulatory definition or call for an alternative interpretation.

Boca repeatedly stresses rule comments and legislative history that it claims indicate Congressional and CMS intent to limit outlier payments to "extraordinarily costly cases" and cases where the hospital's "cost of care was unusually high." Boca Mot. at 8, 9, 12, 13. Even if these terms reflect the underlying purpose of the Medicare Act's outlier provisions, they do not set a governing standard under the Act. Neither phrase can be found anywhere in the statute or regulations. Congress provided only that "charges" would be "adjusted by costs," and CMS defined costs based on a hospital's "billed charges," without limiting outlier payments to hospitals with low charges or to high cost cases.

Thus, whatever the *intent* of Congress and CMS, neither used the phrase "extraordinarily costly," and there is no regulation defining what this inherently ambiguous term might mean. An extraordinarily costly case might be one that is 10 times as costly as the average, 5 times as costly, or twice as costly. Or, extraordinarily costly might simply mean that hospitals that are inefficient, and thus have higher costs, are entitled to outlier payments. It might also mean that CMS is obliged to set a specific dollar amount for every medical procedure, and if a hospital's costs for a particular case exceed that amount, then it is entitled to an outlier payment. Boca

16

does not purport to defend which of these explanations is the correct one, and it points to no statute or regulation that explains it.   Indeed, Boca seems to recognize that it would be difficult to measure the costs of treating an individual patient, Boca Mot. at 7, as such a calculation would need to determine the hospital's labor costs, equipment costs, and other items that have no readily ascertainable "per patient" cost.   *Cf.* 59 Fed. Reg. at 27925-26 (recognizing that "costs are not reported for individual cases").

Boca's attempt to impose an ambiguous limit on outlier payments therefore must fail. Claims about the intent in promulgating a regulation cannot trump the clear language of the regulation itself.  *Cf. Tennessee Valley Auth. v. Whitman*, 336 F.3d 1236, 1255 (11th Cir. 2003) ("[N]o canon of statutory interpretation can trump the unambiguous language of a statute."). Nor is there any principle of construction that would allow a court to "add features that will achieve the statutory 'purposes' more effectively." *Director, Office of Workers' Comp. Programs, Dep't of Labor v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 136 (1995). When faced with clear regulatory language, Tenet had no obligation to speculate that CMS did not mean precisely what it said or to conform its conduct to a hypothetical regulation that would better implement the legislative purpose. *See Nat'l Pub. Radio, Inc. v. FCC*, 254 F.3d 226, 230 (D.C. Cir. 2001) (presumption that language means what it says is "[e]xtremely strong," "rebuttable only in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters").

**B.      Medicare Does Not Restrict The Amount Of A Hospital's Charges.**

Just as there is no Medicare regulation limiting outlier payments to cases falling into the undefined category of "extraordinarily costly," there is no Medicare regulation that sets some unspecified limit on the charges a hospital may submit for outlier reimbursement.  Boca argues that even if Medicare does not regulate charges, it does prohibit a hospital for submitting high

17

charges *for outlier reimbursement.* Boca Mot. at 4 n.9, 14-15. There is no such distinction, however. The outlier program did not have its own charging rules, and as Mr. Scully makes clear, Medicare did not "regulate the listing of charges for the purposes of controlling outlier payments," nor did it "require any particular logical connection between costs and charges used to generate outliers." Scully Decl. ¶ 3. Medicare simply does not dictate what a hospital's charges may be, and no Medicare regulation authorizes a hospital to submit charges for outlier reimbursement that are different from the charges it submits for other reimbursement.

In connection with CMS's review of outlier payments, CMS directed fiscal intermediaries to review a number of hospitals' charging practices, including USC University Hospital (USC) and Brownsville Medical Center (Brownsville). Armin Decl. ¶¶ 4, 7. Boca specifically identifies both USC and Brownsville as two Tenet hospitals that engaged in unlawful charging practices, *see* Compl. ¶ 94, yet the charge reviews concluded for both that for FY 2000 (Brownsville) or FY 2001 (USC), the "auditor did not find any unreasonable or different charging practices on varies [sic] type of patients such [as] private insurance, HMO, PPO, Medicaid, and Medicare patients." Armin Decl. ¶ 4 (USC), *see also id.* ¶ 7 (Brownsville).

The reason is clear. Medicare does not impose any ceiling on or otherwise limit the amount a hospital can charge for services. *See* Scully Decl. ¶ 3; 68 Fed. Reg. at 34501 ("Hospitals set their own level of charges and are able to change their charges, without review by their fiscal intermediaries."); *see also* 42 U.S.C. § 1395 (federal officer may not "exercise any supervision or control over the administration or operation of [any institution providing health services]"). Citing the Medicare Provider Reimbursement Manual (PRM), *available at* 1998 WL 34333256, however, Boca claims that "a hospital's 'charge structure' must be reasonably and consistently related to the cost of providing the services." Boca Mot. at 15. Boca also claims

18

that "a separate provision of the Medicare Act, 42 U.S.C. §1395x(v)(1)(A), imposes limitations generally on the manner in which charges may be used as a surrogate for costs." *Id.* at 16.

Boca's argument is misplaced. The "separate provision" on which it relies is a statutory definition of the term "reasonable cost," which was the basis of the cost-based payment system that Congress replaced in 1983 with a Prospective Payment System (PPS). *See Fischer v. U.S.*, 529 U.S. 667, 685 (2000) (distinguishing "prospective payment system" from "reasonable cost" reimbursement system); *Transitional Hosps. Corp. of La., Inc. v. Shalala*, 222 F.3d 1019, 1021 (D.C. Cir. 2000) (same). "Under PPS, hospitals are reimbursed according to flat rates established in advance for the various categories of patient diagnoses (known as 'diagnosis-related groups' or 'DRGs')." *Id.* Outlier payments are not part of the old reasonable cost system, but are supplemental payments made in addition to the standard flat PPS disbursement. *See id.* Boca's reliance on the "reasonable cost" provision reflects a fundamental misunderstanding of the current Medicare reimbursement method. *See also Tallahassee Mem'l Reg'l Med. Ctr. v. Bowen*, 815 F.2d 1435, 1438 n.3 (11th Cir. 1987) (noting that reasonable-cost reimbursement scheme has been "largely phased out").

The provisions of the Provider Reimbursement Manual on which Boca relies are likewise inapposite, because they govern *cost apportionment*, not outlier reimbursement. As the Manual explains, "[t]he law provides that the costs of services to individuals covered by the health insurance program will not be borne by individuals not so covered, and, conversely, that costs of services to individuals who are not under the program will not be borne by the program." PRM § 2207.1. Thus, "[t]otal allowable costs of a provider are apportioned between program beneficiaries and other patients so that the share borne by the program is based upon actual services received by program beneficiaries." *Id.* § 2200. In order for the fiscal intermediaries to

19

apportion costs, Medicare provides guidelines. In § 2203 of the Manual, entitled, "Provider Charge Structure As Basis For Apportionment," Medicare instructs fiscal intermediaries that, *for purposes of apportioning costs* between Medicare and non-Medicare payors, the fiscal intermediary should use charges that are "applied uniformly," and which are "reasonably and consistently related to the cost of providing the services." PRM § 2203, *available at* 1998 WL 34333256. Section 2203 governs only "the charges ... allowable for use in *apportioning costs*," PRM § 2203 (emphasis added), however, and says nothing about the charges "allowable" in general or for outlier reimbursement. It also does not purport to dictate a hospital's charges. Quite the opposite: it explicitly recognizes that "the Medicare program cannot dictate to a provider what its charges or charge structure may be."

In stark contrast to the cost apportionment rules, which suggest that a fiscal intermediary may use something other than the hospital's actual charges in apportioning costs, the outlier regulations require that the fiscal intermediary determine outlier costs based on "the *billed charges* for covered inpatient services." 42 C.F.R. § 412.84 (emphasis added). CMS has instructed providers to use a UB-92 form "for all provider billing, except for the professional component of physician services." CMS Medicare Claims Processing Man. Pub. 100-4, Ch. 3, § 10.1, *available at* 2004 WL 3263369. This UB-92 form contains patient information including *billed charges. See* 68 Fed. Reg. at 34500. It does not contain case-specific costs. From this form, the fiscal intermediary determines how much is owed to providers for both fixed PPS payments and outlier payments. *See id.*; *see also* CMS Medicare Claims Processing Man. Pub. 100-4, Ch. 3, § 20.1.2. CMS instructs the intermediary to "pay any outlier amount indicated by its Pricer program," unless the hospital has requested no outlier payment. *Id.*

Thus, contrary to Boca's suggestion, a hospital does not submit a separate "outlier billing" form, and there is no regulatory provision authorizing a hospital to submit charges *different from* its actual billed charges to a fiscal intermediary for reimbursement. As Boca's own expert testified in a prior proceeding, "I'm not of the opinion that Tenet's outlier performance was in some way illegal or anything like that." 9-30-03 Dep. of Rick Knapp, *Boca Raton Comm. Hosp., Inc. v. Agency for Healthcare Admin.*, No. 01-2713, at 59-60, attached as Exhibit 6. Medicare does not regulate a provider's charges, and it affirmatively requires that a hospital use its actual billed charges for outlier reimbursement. Tenet's alleged conduct in submitting high charges for outlier reimbursement was therefore lawful. *See* Scully Decl. ¶¶ 4, 6, 8, 9 (describing practice of submitting high charges for outlier reimbursement as "legal" billings).

**C.    The Administrative Record Demonstrates That Tenet's Alleged Conduct Is Not Unlawful.**

Despite its efforts to construe the outlier statute and regulations, Boca ultimately argues that this Court should defer to the administrative record and the United States amicus curiae brief submitted in conjunction with Tenet's motion to dismiss. Boca Mot. at 12-14. Boca's argument is misleading and flat wrong. CMS did not "state[]" anything in the amicus brief, because CMS did not submit the amicus brief – DOJ did. Fundamental principles of administrative law teach that DOJ's interpretation is entitled to no deference, because it is not the agency charged with administering Medicare. *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984). While Boca again relies on CMS's intent to pay outliers for "atypical" or "costly" cases, the administrative record demonstrates as a matter of law that CMS will provide an outlier payment to any case that qualifies under its regulatory formula and that CMS has interpreted its outlier regulations as not prohibiting a hospital from submitting high charges for

21

outlier payments. Indeed, CMS recognized that its outlier regulations allowed hospitals to do precisely that, and it *changed* its formula in 2003 in order to tie outlier payments more closely to actual costs of services. CMS did not, however, make its rules retroactive, which is precisely what Boca would have this Court do.

      1.    **The DOJ Amicus Brief Is Owed No Deference, Because DOJ Is Not Charged With Administering Medicare.**

      Boca claims that it is CMS's view that "the Outlier Regulations do not permit hospitals to bill for outliers based on charges that are not related to costs," and that "CMS stated this interpretation without the slightest equivocation in the *Amicus Curiae* Memo." Boca Mot. at 14. CMS stated no such thing, and certainly did not do it unequivocally, because CMS did not submit an amicus brief. DOJ submitted a brief on behalf of the United States, which "is currently investigating whether Tenet violated the federal False Claims Act," "[b]ecause of the significance of Tenet's Motion to claims that the United States itself may have against Tenet under the False Claims Act, or otherwise, and to the integrity of the Medicare program generally." No attorney from the Department of Health & Human Services or CMS was listed on the brief, and notably, DOJ did not argue that the Court should defer to what was DOJ's, not CMS's, interpretation of the outlier regulations. It is a matter of black-letter law that *Chevron* deference applies only "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1178 (11th Cir. 2003) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001)). While DOJ is charged with making rules implementing some statutes, like the Americans with Disabilities Act, *see id.* at 1179, it is not the agency charged with administering the Medicare program – CMS is, *see Community Care Found. v. Thompson*, 318 F.3d 219, 221

22

(D.C. Cir. 2003) – and its interpretation of the outlier regulations in the amicus brief is therefore

owed no deference. *See Chevron*, 467 U.S. at 844; *Amax Land Co. v. Quarterman*, 181 F.3d

1356, 1368 (D.C. Cir. 1999).

In any event, even if CMS had filed an amicus brief interpreting its regulations to prohibit

hospitals from submitting high charges for outlier reimbursement, "[d]eference to what appears

to be nothing more than an agency's convenient litigating position would be entirely

inappropriate." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988). Courts "do not

afford deference to ad hoc positions of agencies adopted in reaction to the exigencies of

litigation; rather, deference is due when an agency has taken a constant and unchanging--and

reasonable--position on the proper interpretation of its regulation." *U.S. Steel Mining Co. v.

Director, OWCP*, 386 F.3d 977, 986 (11th Cir. 2004). The amicus brief reflects a position taken

in order to protect the government's "significant interest" in investigating whether CMS overpaid

Tenet "more than $1.6 billion in outlier payments." DOJ Amicus Br. at 5. As explained below,

the amicus brief does not reflect CMS's longstanding position that it will reimburse hospitals for

any case that meets its outlier formula and that Medicare imposes no limit on the amount of

charges a hospital submits for outlier reimbursement, and thus is entitled to no deference.

    2.    **CMS Has Recognized That Medicare Does Not Prohibit A Hospital
From Submitting High Charges For Outlier Reimbursement.**

The administrative record and the attached declaration from Mr. Scully make clear that

CMS did not believe that Tenet's alleged conduct was unlawful: The Medicare Act does not

prohibit a hospital from seeking reimbursement for *any case* that meets the outlier criteria set

forth in CMS regulations, regardless of how high a hospital's charges are. *See* Scully

Declaration ¶ 3-4, 6, 8, 9. Indeed, CMS has repeatedly recognized that hospitals can maximize

outlier payments by increasing charges, but it declined to close this "loophole" in its regulatory

scheme until 2003. As Mr. Scully testified in March 2003, "[h]ospitals, under the regulations and under the law, can still bill us for [high outlier payments]," until the rules are amended. Scully Testimony at 5. Indeed, "[t]he fact that [CMS] had to craft a new regulation to fix the situation, in itself, clearly indicates that the inappropriate practices under the original regulation did in fact fall with[in] the scope of the law." Scully Decl. ¶ 9. "The regulations were clearly not retroactive," *id.* ¶ 7, and Boca cannot now apply them retroactively.

In exercising its discretion as the administrator of Medicare, CMS explicitly elected to tie outlier payments to a hospital's billed charges, despite comments that this approach would permit hospitals to increase charges to obtain higher outlier payments—the very allegation levied by Boca. *See Medicare Program*, 53 Fed. Reg. 38476, 38509 (Sept. 30, 1988) (comment reflecting concern that emphasis on cost outliers would create "an incentive for hospitals to increase their charges"). In response to these comments, the Secretary acknowledged that, because "both the cost-to-charge ratio ... and the threshold are constant for the payment period, the payment received by the hospital *can be increased by increasing charges*. In addition, hospitals can conceivably change their charge structures, just as is the case at present, to maximize their outlier payments." *Id.* (emphasis added). CMS recognized that "concern over this type of incentive is appropriate," but determined that other factors would mitigate the effects. *Id.* CMS stated that it would "continue to investigate potential improvements in the measurement of case level costs." *Id.*

CMS knew that hospital charges were increasing at a faster rate than costs, *see id.* at 38507, yet continued to measure case level costs by a hospital's outdated cost-to-charge ratio and billed charges. Thus, in 1994, commenters again expressed concerns that the outlier formula's use of a statewide average cost-to-charge ratio "created a clear incentive for hospitals to

24

artificially inflate their gross charges." *Medicare Program*, 59 Fed. Reg. 45330, 45407-08 (Sept. 1, 1994). The Secretary again acknowledged that concern, while nonetheless determining that CMS should "continue to use statewide cost-to-charge ratios where the cost-to-charge ratio for any hospitals falls outside the prescribed ranges," without imposing any other limitation on use of the statewide average. *Id.*

If Boca were correct that Medicare limited the charges a hospital could submit for reimbursement, these comments would make no sense. There would be no concern that the outlier formula provided an incentive for hospitals to increase charges, because per Boca's argument, hospitals would be prohibited from using high charges for outlier reimbursement. The comments do make sense, however, and CMS has accordingly never defended its regulations with Boca's reasoning, because CMS imposed no restriction on charges. Scully Decl. ¶ 3. To the contrary, CMS has recognized that the Medicare program does not prevent providers from setting charges at whatever level they deem appropriate. *See* 68 Fed. Reg. at 34501 (observing that hospitals' charges are not subject to review); Br. of Appellee Donna E. Shalala, Sec'y of Health & Human Servs. at 32, *Stephenson v. Shalala*, No. 95-15729, 87 F.3d 350 (9th Cir. 1996) ("Congress did not … prescribe the amount which physicians could charge beneficiaries."), *available at* 1995 WL 17069409; Medicare Provider Reimbursement Manual § 2203 (recognizing that "the Medicare program cannot dictate to a provider what its charges or charge structure should be"). And CMS has made clear that it would "pay for any outlier that meets the criteria, even if aggregate outlier payments result in more than six percent of total payments." *Medicare Program*, 49 Fed. Reg. 234, 265 (Jan. 3, 1984). It is simply not unlawful for a hospital to use actual billed charges for outlier reimbursement, regardless of how high those charges are. Scully Decl. ¶¶ 4, 6, 8, 9.

3.   **CMS Revised The Outlier Regulations In 2003 To Tie Outlier
     Payments More Closely To Actual Costs But Did Not Make The New
     Rules Retroactive.**

CMS ultimately did make "improvements in the measurement of case level costs."
*Medicare Program*, 53 Fed. Reg. 38476, 38509 (Sept. 30, 1988). Despite earlier comments, that
incentives for hospitals to increase charges would be counter-balanced by other incentives not to
increase charges, *see id.*, CMS determined in late 2002 that it should change the outlier
regulations in order to address the impact of increased charges on outlier reimbursement. *See*
Scully Decl. ¶ 4; 68 Fed. Reg. at 34500-501. Boca recognizes that CMS changed the outlier
regulations, but it fails to acknowledge that CMS did not apply the rule retroactively and that
CMS expressly recognized that the old rules allowed hospitals to increase charges in order to
maximize outlier payments.

The amendments made three key changes. The first allows the fiscal intermediary to
calculate outlier payments using a cost-to-charge ratio based on a more current cost report. *See*
42 C.F.R. § 412.84(i)(2). CMS explained that this would tie outlier payments more closely to
actual costs, because the hospital's billed charges (which reflect charge increases) would be
adjusted by cost-to-charge ratios that also reflected recent charge increases. *See* 68 Fed. Reg. at
34497. The old rule, which used out-of-date cost-to-charge ratios, "overestimate[ed] costs" and
may have "result[ed] in some cases receiving outlier payments when these cases, in actuality, are
not high-cost cases." *Id.* The second change eliminated the use of a higher statewide average for
hospitals with very low cost-to-charge ratios. *See* 42 C.F.R. § 412.84(i)(3). CMS again
recognized that "under [the old] regulations, these hospitals benefit from an artificially high ratio
being applied to their high charge," and that "hospitals can continue to increase charges faster
than costs." 68 Fed. Reg. at 34499. And the third change made outlier payments subject to
reconciliation on a case-by-case basis. *See* 42 C.F.R § 412.84(i)(4). CMS explained that this

would ensure that "outlier payments would be based on the relationship between the hospital's costs and charges at the at the time a discharge occurred." 68 Fed. Reg. at 34501.

The amended rule thus implements a formula designed to "ensure that when final outlier payments are made, they ... reflect an accurate assessment of the actual costs the hospital incurred." *Id.* Critically, however, CMS's comments acknowledged that neither the old rule nor the new rule restricted a hospital's right to set its own charges or to submit outlier claims for cases that meet the prescribed formula. The new rule also expressly provides that "[f]or discharges occurring before August 8, 2003," fiscal intermediaries were *required* to use the prior formula, which, as discussed, did *not* tie outliers to the hospital's actual costs in treating patients. 42 C.F.R. § 412.84(h); *see also* 68 Fed. Reg. at 34512, 34515. Thus, even after CMS changed the rule, it continued to reimburse hospitals for claims based on high charges. As Mr. Scully recognizes, "hundreds of [non-Tenet] hospitals ... continued to bill Medicare for additional payments for eight months," before the new regulations went into effect. Scully Decl. ¶ 6.

\* \* \* \* \* \* \* \* \* \*

At bottom, Boca's complaint is with CMS's outlier regulations, which allowed hospitals that increased their charges to receive outlier payments for cases that were not unusually costly. CMS acknowledged the incentives created by its regulations, but it declined to change the rules until 2003. CMS has not sought to apply the new rules retroactively to limit Tenet's outlier payments to actual costs, and Boca certainly cannot do so. Thus, as Mr. Scully eloquently explains, there is no provision of Medicare that either restricted a hospital's charges or that would give effect to Boca's claim that only "extraordinarily costly" cases are eligible for Medicare. Boca's motion is essentially an invitation for this Court to rewrite the Medicare statute and regulations and to retroactively impose an ambiguous limitation on CMS's outlier

27

formula. Tenet's alleged conduct in submitting high charges for outlier reimbursement –– whether appropriate or not -- was not *unlawful* under either the clear language of Medicare's outlier provisions or CMS's interpretation of those provisions, as reflected in CMS's rulemaking and Mr. Scully's Declaration, and cannot be deemed so now as a matter of law.

## CONCLUSION

For the foregoing reasons, the Court should deny Boca's motion for partial summary judgment and grant Tenet's motion for partial summary judgment on the question relevant to all counts, whether its alleged conduct in submitting high charges for outlier reimbursement was unlawful.

Respectfully submitted,

Peter Prieto (FL Bar No. 501492)
Scott D. Ponce (FL Bar No. 0169528)
HOLLAND & KNIGHT LLP
701 Brickell Avenue, Suite 3000
Miami, FL, 33131
(305) 374-8500 (tel.)
(305) 789-7799 (fax)

Jay P. Lefkowitz
Karen N. Walker
Susan E. Engel
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC   20005
(202) 879-5000 (tel.)
(202) 879-5200 (fax)

*Attorneys for Tenet Healthcare Corp.*

# 3476927_v1

28

## SERVICE LIST

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via mail on this 23ʳᵈ day of December 2005 to all persons appearing below.

Charles J. Crist, Jr.
Attorney General
Christopher M. Kise
Solicitor General
Chris_Kise@oag.state.fl.us
PL-01, The Capitol
Tallahassee, FL 32399-1050
Ph: 850-414-3681
Fax:850-410-3672

Paul C. Huck, Jr.
Paul_Huck@oag.state.fl.us
110 East 6ᵗʰ Street, 10ᵗʰ Floor
Ft. Lauderdale, FL 33301
Ph: 954-712-4600
Fax: 954-712-4707

Lori S. Rowe
Lori_Rowe@oag.state.fl.us
Russell S. Kent
Russell_Kent@oag.state.fl.us
PL-01, The Capitol
Tallahassee, FL 32399-1050
Ph: 850-414-3600
Fax: 850-487-9475

Hilarie Bass
BassH@gtlaw.com
David A. Coulson
CoulsonD@gtlaw.com
Greenberg Traurig, P.A.
1221 Brickell Avenue
Miami, FL 33131
Ph: 305-579-0500
Fax: 305-579-0717

Hal M. Hirsch
hirsch@gtlaw.com
Richard A. Edlin
edlinr@gtlaw.com
Greenberg Traurig, P.A.
200 Park Avenue
New York, N.Y. 10166-0005
Ph: 212-801-9200
Fax: 212-801-6400

Robert P. Charrow
charrowr@gtlaw.com
Greenberg Traurig, P.A.
800 Connecticut Avenue, NW, Ste.500
Washington, D.C. 20006
Ph: 202-331-3100
Fax: 202-331-3101

Maya S. Saxena
msaxena@milbergweiss.com
Christopher S. Polaszek
cpolaszek@milbergweiss.com
Milberg Weiss Bershad & Schulman LLP
Tower 1 – Suite 600
5200 Town Center Circle
Boca Raton, FL 33486
Ph: 561-361-5015
Fax: 561-367-8400

Melvyn I. Weiss
mweiss@milbergweiss.com
David A.P. Brower
dbrower@milbergweiss.com
Milberg Weiss Bershad & Schulman, LLP
One Pennsylvania Plaza
New York, N.Y. 10119-1065
Ph: 212-594-5300
Fax: 212-868-1229

# 2756736_v1